IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 10, 2007 Session

## WILLARD D. GORE, ET AL. v. TONY STOUT, ET AL.

**Appeal from the Circuit Court for Putnam County**
**No. 04N0060    John Maddux, Judge**

---

**No. M2006-02111-COA-R3-CV - Filed February 19, 2008**

---

This appeal involves a dispute between two landowners over use of a route across the defendants' land that the plaintiffs use for access to their nearby land. Plaintiffs filed suit contending they had a right to use the disputed route. The trial court determined that the route had been dedicated and accepted as a public road, that the plaintiffs were entitled to a prescriptive easement over the defendants' land, and that the plaintiffs had a right to use the road by adverse possession. We have determined that the contested section of the route is not a public road, that adverse possession does not apply, and that the plaintiffs are entitled to a prescriptive easement over the defendants' land.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part and Reversed in Part.**

ROBERT S. BRANDT, SP. J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

C. Dewees Berry, Nashville, Tennessee, for the appellants, Tony Stout and Linda Stout.

David Owen Day, Cookeville, Tennessee, for the appellees, Willard D. Gore and Marina F. Gore.

**OPINION**

This is a dispute between two families over access to land in Putnam County. Willard D. and Marina F. Gore claim a right to use a route across the land of Tony and Linda Stout. The trial court found that the route is a public road, that the Gores have a prescriptive easement, and that they own the route by adverse possession. We conclude that the contested parts of route are not a public road and that adverse possession does not apply. We agree with the trial court, however, that the Gores have a prescriptive easement.

The Gores and the Stouts each own large non-contiguous tracts in the serrated landscape between Cookeville and Carthage where the Eastern Highland Rim gives way to the Central Basin. Neither the Gores nor the Stouts use these lands as their primary residences. The route at issue leads toward the Gores' land from Little Indian Creek Road, a public county road that extends north from

U.S. 70N west of Cookeville. The lands of the Stouts and the Gores are separated by land belonging to Mike Elliot. Mr. Elliot has no objection to the Gores traveling across his land from the Stouts' land to their land.

In 1996, the Gores purchased their land from Jon Johnson. They soon started building a cabin on the spine of a narrow ridge near their boundary with Elliot, the part of their land closest to the Stouts' land. Though the Gores have some frontage on Little Indian Creek Road, due to the steep terrain, it is difficult, if not impossible, to safely travel to their cabin directly from the county road. The Gores instead use the route across the Stouts' and Elliot's lands.

Johnson in 1980 purchased his land, which included what is now the Gores' land, from Max and Molly Huddleston. When in 1996 Johnson sold part of his land to the Gores, he kept the rest. At the trial, the part that he kept was sometimes called the "lower part" and the part he sold to the Gores was sometimes called the "ridge part." Johnson uses a direct route to Little Indian Creek Road to access the lower part where he has his primary residence.

The record contains photographs, maps, and a video recording that present a clear picture of the route the Gores use to cross the Stouts' land. It is in three distinct sections. Section One, the longest, is a one-lane track covered in limestone gravel that runs from Little Indian Creek Road to the Fields Cemetery. Section Two is a continuation of that track, though it is covered with rocks taken from the Stouts' land. There are places where grass has grown up in the middle, leaving two smaller parallel tracks. The road climbs a ridge as it passes the cemetery and then more or less levels off. Pasture borders Sections One and Two. Section Three of the Gores' route is a 125-meter-stretch that veers off from the rock-covered track onto a narrow side ridge. It begins as a beaten down path through pasture, but becomes more obvious where it goes through the woods. It consists of parallel rock and dirt-covered tracks. During Johnson's ownership of the Gores' land, he and Mr. Gore erected a gate where Section Three ends at Elliot's land.

This dispute is over Sections Two, the rocky road up the ridge from the cemetery, and Section Three, the path that veers away from it. Section One, which stretches from the county road to the cemetery, is not in dispute. The Stouts do not contest the Gores' right to use Section One, but it is of no use to the Gores if they cannot use the other two sections.

The gravel and rock covered track on the Stouts' land, Sections One and Two, and the continuation of it deeper into the Stouts' land are known as "Junior Anderson Road." (Junior Anderson once lived on the road.) Putnam County has erected a standard intersection sign where it meets Little Indian Creek Road. The sign identifies the track as Junior Anderson Road. Nevertheless, there is a gate across Section One between the county road and the cemetery. Though the Gores did not purchase the land until 1996, Mr. Gore has used the route since Johnson acquired it in 1980. Mr. Gore and Johnson are friends, and Johnson allowed Gore to hunt on the land.

Mr. Gore got his first hint of trouble with the Stouts on July 4, 2001, twenty-one years after Johnson started using the route in 1980 and seven years after the Gores purchased their land. As Mr.

Gore tells it, Mr. Stout saw him and a companion using the route. Stout called Gore that night and asked who was with him and asked if Gore had left the gate open. Gore responded that he had not left the gate open and that his companion was Michael Martin, the county school director. (Mr. Gore is the deputy director.) Then about two weeks later, according to Mr. Gore, Mr. Stout again called him. His tone was hostile. "He was mad," Gore testified. Stout asked if Gore was responsible for the termination of teacher Sue Stout. During the conversation Stout made derisive comments about Johnson. In neither of these calls did Mr. Stout tell Mr. Gore to stop crossing his property.

Mr. Gore testified that he did not hear anything more from Mr. Stout until June 2003. Gore and Johnson had been using the route without objection for twenty-three years. Stout called Gore and said that he was going to lock the gate between the county road and the cemetery and that he was going to block the route where it ends at Elliot's land by putting a fence across the gate, thus blocking the Gores' route in two places. In either that conversation or a later one, Gore pointed out to Stout that he had been using the route for a long time. According to Gore, Stout replied: "I know you have, but that is ended now because I'm fixing to wire the gate up and I'm fixing to lock the gate on Section 1." Gore then visited the property daily to see if the gate was locked. Sometimes it was, and sometimes it was not.

In February 2004, the Gores filed this suit. They continued to use the route under the protection of a temporary injunction. It appears that just about anyone who might know anything about use of the route was rounded up and questioned in days of depositions and trial. Two people who did not testify were two parties, Marina Gore and Linda Stout. The trial court concluded in findings of fact and conclusions of law that the route at issue is a public road, that the Gores have a prescriptive easement, and that they have an easement by adverse possession. The court issued a permanent injunction. The Stouts appeal the trial court's ruling.

## I. SCOPE OF APPELLATE REVIEW

The standard of review of a trial court's findings of fact is *de novo* and we presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). Where the trial court does not make findings of fact, there is no presumption of correctness and we "must conduct our own independent review of the record to determine where the preponderance of the evidence lies." *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn. 1999). We also give great weight to a trial court's determinations of credibility of witnesses. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). Issues of law are reviewed *de novo* with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

## II. ANALYSIS

-3-

Our task is to determine the whether the trial court erred by: (1) finding that the Gores proved by clear and convincing evidence that Sections Two and Three are a public road; (2) finding that the Gores proved by clear and convincing evidence that they are entitled to a prescriptive easement over the Stouts' property; and (3) applying statutory and common law adverse possession.

We conclude that the Sections Two and Three are not a public road and that the Gores did not acquire the route by adverse possession. We do agree with the trial court that the Gores have a prescriptive easement over the road at issue.

**Witness Credibility**

There are sharp differences in the testimony of Mr. Gore and Mr. Johnson on the one hand and Mr. Stout and his son on the other. (Most of the other witnesses added little or nothing.) The trial court found that Mr. Gore was a "very credible witness" and that Mr. Johnson was also a "credible witness." With regard to the credibility of Stouts' witnesses, however, the trial court stated:

> This court is of the opinion that the defendants presented an impressive array of very nice witnesses. However, the court observed that upon a sharp cross examination that each of the witnesses for the defendants came up short in terms of persuading the court in regard to the issues that were set out in this case. This court finds that credible evidence to support the defendants' contentions does not exist and is not found in the record in this case.

In cases where the credibility of the witnesses are at issue, we review credibility determinations made by the trier of fact with great deference. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Trial courts, unlike appellate courts, are able to "observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility." *Id*. Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility unless clear and convincing evidence to the contrary exists. *Id*.

The deference to the trial court's credibility determination is even stronger in this case. In their Reply Brief, the Stouts are adamant that the issue of credibility is not at issue on appeal. Accordingly, the Stouts do not challenge the credibility of the Gores' witnesses. Rather, the Stouts contend that even in the absence of any refuting evidence, the Gores failed to prove their case by clear and convincing evidence. The Stouts explicitly state in their Reply Brief that they do not rely upon the testimony of their witnesses or exhibits.

Therefore, we need not review the credibility of the witnesses in making our determination. As a result, the question on appeal is whether the evidence presented by the Gores preponderates against the findings of the trial court.

**Public Road**

The Stouts do not contest the right of the Gores to use Section One of the route, the stretch between Little Indian Creek Road and the Fields Cemetery. The inquiry thus is whether Sections Two and Three are a public road. We conclude that the trial court erred in finding that the Gores proved by clear and convincing evidence that any part of the route other than Section One has been dedicated to the public and is now a public road.

To establish a public road by implication, the proponent must satisfy two requirements. First, the landowner must intend to dedicate the road to the public. *McCord v. Hays*, 302 S.W.2d 331, 333 (Tenn. 1957). Second, the public must expressly or impliedly accept the road. *Id*. The burden of proof is heavy. In short, the proponent must present

> proof of facts from which it positively and unequivocally appears that the owner intended to permanently part with his property and vest it in the public, and that there can be no other reasonable explanation of his conduct. In other words, dedication is a question of intention, and the intent must be clearly and satisfactorily proven.

*McKinney v. Duncan*, 118 S.W. 683, 684 (Tenn. 1909).

The trial court relied upon the following language of the deed that conveyed the property to the Stouts:

> Included in the foregoing description but excluded from this conveyance is a small family cemetary which lies on the southerly side of the road that traverses the ridge, running East to West on the aforesaid real property. Said cemetary is presently under fence. *The right of ingress to said cemetary is reserved to the public*. (emphasis added).

Nowhere does the deed state that Section Two, the section *past* the cemetery, is to be a public road. Instead, the language grants public ingress only for access to the cemetery.

In addition to the deed, the trial court relied on Mr. Stout's request that the county maintain the route past the cemetery. Mr. Stout asked the county to gravel the entire length of the track. But this was just an attempt to get a little free work, to "gouge" the county as Mr. Stout put it. His intent was to save money, not to donate a road to the county. The county declined his request.

The trial court found dedication by public use. Permitting public use can imply dedication. *Cole v. Dych* 535 S.W.2d 315, 319 (Tenn. 1976). But other than the Stouts, no one except the Gores, people on the way to the Gores' cabin, or the Gores' predecessors, have used Junior Anderson Road beyond the cemetery. Dedication by public use has not been established.

Even if the Stouts intended to dedicate the route, there was still no public acceptance. The trial court found the following with regard to the county's acceptance of the road:

> [T]he Putnam County Highway Department has maintained the roadway up to the cemetery as part of a public policy of maintaining all the roads to private cemeteries, and the county considers that portion of the roadway as a public road, but it hasn't taken any official position as to the remainder of the road.

There are some indications that the public has accepted Section One, the part of Junior Anderson Road to the Fields Cemetery. Putnam County erected the intersection sign at Junior Anderson Road and Little Indian Creek Road. The county has performed some minimal maintenance on Section One. Junior Anderson Road appears on the official Putman County 911 emergency response map and on other maps, and it is listed on the official list of Putnam County roads. But the county has never done any maintenance on the rest of Junior Anderson Road despite Mr. Stout's request.

Whether Section One is a public road is not an issue in this appeal, because, as noted, the Stouts do not contest the Gores' right to use it, and no other member of the public or the county is asserting that it is a public road. We do conclude that the evidence is insufficient to establish that Sections Two and Three constitute a public road.

**Prescriptive Easement**

Because Sections Two and Three of the Gores' route across the Stouts' land are not a public road, the inquiry shifts to whether the Gores have some other legal right to use the route. While the evidence necessary to establish a prescriptive easement could be stronger -- as in every case asserting a prescriptive easement -- we concur with the trial court that the Gores established a prescriptive easement for Sections Two and Three.

An easement is an interest in another's real property that confers on the easement holder an enforceable right to use that real property for a specific use. *Brew v. Van Deman*, 53 Tenn. (6 Heisk.) 433, 436 (1871)). The most common form of an easement is a right of passage across another's property. *Shew v. Bawgus*, 227 S.W.3d 569, 578 (Tenn. Ct. App. 2007). In Tennessee, easements can be created in several ways: (1) express grant, (2) reservation, (3) implication, (4) prescription, (5) estoppel, and (6) eminent domain. *Pevear v. Hunt*, 924 S.W.2d 114, 115-16 (Tenn. Ct. App. 1996). A prescriptive easement is an implied easement that is premised on the use of the property rather than language in a deed. *Shew*, 227 S.W.3d at 578. To create a prescriptive easement, the use and enjoyment of the property must be adverse, under a claim of right, continuous, uninterrupted, open, visible, exclusive, with the knowledge and acquiescence of the owner of the servient tenement, and must continue for the full prescriptive period. *Pevear*, 924 S.W.2d at 116 (citing *Keebler v. Street*, 673 S.W.2d 154 (Tenn. Ct, App. 1984). The proponent must prove each of the elements by "clear and convincing evidence." *Stone v. Buckley*, 70 S.W.3d 82, 86 (Tenn. Ct.

-6-

App. 2001).  In Tennessee the prescriptive period is twenty years.  *Nashville Trust Co. v. Evans*, 206 S.W.2d 911, 913 (Tenn. Ct. App. 1947).

The Stouts challenge the trial court's grant of a prescriptive easement on three grounds.  First, the Stouts contend the Gores should not have been allowed to "tack" their predecessors' use of the road in order to establish the requisite time period.  Second, they contend that the Gores failed to establish that the prior owners' use of the road was adverse, hostile, and under a claim of right.  Finally, the Stouts contend that the Gores failed to establish that their use and their predecessor's use of the route was continuous and uninterrupted before 1996 when the Gores bought their land from Johnson.

**Tacking**

In order to establish the requisite twenty-year prescriptive period, a party has the right to "tack" on the adverse use of his predecessor's title.  *See Laurel Valley Property Owners Ass'n, Inc. v. Hollingsworth*, No. E2003-01936-COA-R3-CV, 2004 WL 1459404 at *8 (Tenn. Ct. App. June 29, 2004).  The concept of tacking allows one claiming a prescriptive easement to add his or her period of use to his predecessor's period use in order establish the requisite prescriptive period.  "Tacking requires that the combined periods be successive, that each possession must meet the elements of prescriptive easement, and that the possessions be in privity." *Id* (quoting *Thompson v. Hulse*, E1999-02474-COA-R3-CV, 2000 WL 124787, at *3 (Tenn. Ct. App. Jan. 26, 2000).  This Court has recognized exceptions to the privity requirement.  *See Thompson v. Hulse*, No. E1999-02474-COA-R3-CV, 2000 WL 124787, at *4 (Tenn. Ct. App. Jan. 26, 2000).  In *Thompson*, the Court stated,

> The general rule that successive adverse possessions cannot be tacked unless the possessors are connected by some form of legal privity was applied in *Erck v. Church*, supra, and *Ferguson v. Prince*, 136 Tenn. 543, 190 S.W. 548.  However, the rule is subject [to] exceptions.  In *Rembert v. Edmondson*, 99 Tenn. 15, 41 S.W. 935, 63 Am.St.Rep. 819, a parol understanding that a strip on the rear of a lot conveyed by deed would go with the lot to the extent the grantor had any title to convey was held to supply the necessary privity although the strip adjoining the lot conveyed was not within the calls of the deed.  *See also Tuggle v. Southern Railway Co.*, 140 Tenn. 275, 204 S.W. 857; *Mercy v. Miller*, 25 Tenn.App. 621, 166 S.W.2d 628.

*Thompson*, 2000 WL 124787, at *4.  Accordingly, tacking can be established, in the absence of a conveyance of a right by deed, by a parol understanding that an unwritten right of use is conveyed along with the property specifically conveyed in the deed.  The Court in *Thompson* clarified the issue by stating:

> The contractual intention to connect successive adverse possessions through tacking requires the property claimed through the judicial mechanism to establish prescriptive easement be described in the deed transferring ownership between the

adverse possessors, *or be established through parol evidence sufficient to establish the buyer's right of reasonable reliance on representations made by the buyer's predecessor relating to the transfer of ownership.*

*Thompson*, 2000 WL 124787, at *4 (emphasis added).

The deed transferring the land from Johnson to the Gores does not mention Junior Anderson Road or any easement or right-of-way across the Stouts' land. As a result, for the requisite tacking to be present, there must be clear and convincing evidence of a parole understanding between Johnson and the Gores that Johnson conveyed to the Gores the right to use the route.

The trial court found that Johnson advised the Gores that the disputed roadway through the Stouts' property was the way to get to their property. The court also found that Johnson stated that his predecessor in title, Max Huddleston, told him that the disputed roadway was the access to that portion of the property. At trial the issue was the subject of considerable discussion. The trial court, however, did not make a specific finding on whether there was a parol understanding between Johnson and the Gores.

Mr. Gore did not testify that before the sale Johnson made an explicit statement about the right to use the route. However, evidence of such an explicit statement is not required. What is required is a parol *understanding* between the parties at the time of the transfer. *See Thompson*, 2000 WL 124787, at *4. Moreover, statements and conduct after the sale are strong evidence of the parties' understanding at the time of the sale.

Mr. Gore recalled that before he purchased the land, he and Johnson discussed using the route for building the cabin. Mr. Gore testified that he traveled the Junior Anderson Road route with Johnson on the very day he purchased the land. With respect to his predecessors in title, Mr. Gore recalled Johnson telling him of Johnson's conversation with Max Huddleston about the right to use the route.

Johnson did recall a discussion with Mr. Gore about Gore needing to use the route for construction vehicles to get to the cabin site, but Johnson does not recall whether that was before or after the sale. At one point, he did testify that it had to have been sometime during the negotiations for sale of the property.

The context of Johnson-to-Gore transaction is significant in ascertaining their understanding. The only feasible access to the Gores' cabin is over the disputed route. The Gores' land is not practically accessible any other way due to the steep topography of the land bordering Little Indian Creek Road. In fact, the trial court found that it is basically impossible to access the cabin from Little Indian Creek Road, except in perfect weather. Mr. Gore used the route to get to the land when Johnson owned it. Mr. Gore traveled the road with Johnson on more than occasion, including the day that he bought the property. After the sale, Mr. Gore traveled over the land to bring in building materials, propane tanks, septic tanks, and field lines. He continues to use the route to this day.

All of this evidence – Johnson and Mr. Gore's discussions, the fact that there is no other feasible access to Gore's land, and their use of the route both before and after the sale – can only lead to one conclusion: Johnson and Gore had a parol understanding that Johnson was transferring the right to use the route.

**Adverse, Hostile, and Under a Claim of Right**

We conclude that Johnson's and the Gores' use of the road has been adverse, hostile, and under a claim of right.

This Court in *House v. Close*, 346 S.W.2d 445, 448 (Tenn. Ct. App. 1961), stated:

[I]t is stated that to be adverse, the use must be under a claim of right inconsistent with or contrary to the interest of the owner and of such a character that it is difficult or impossible to account for it except on the presumption of a grant; or use under a claim of right known to the owner of a servient tenement; or use whenever desired without license, or permission asked, or objection made such as the owner of an easement would make of it, disregarding entirely the claims of the owner of the land.

*House*, 346 S.W.2d at 448 (citing 28 C.J.S. *Easements* § 14).

Use by permission of the owner is not adverse and hostile. If the proponent asks permission, and the owner grants it, either expressly or by implication by allowing continued use, or if the owner makes it clear that the use is only with permission, even in the absence of a request, this would strongly indicate that the proponent's use was permissive and not adverse. There is no evidence that Johnson or the Gores asked the Stouts for permission and no evidence that the Stouts informed Johnson or the Gores that they were giving them permission to use the route.

Mr. Gore had regular contact with Mr. Stout as he crossed the Stouts' land. There is also testimony about encounters with members of the Stout family at school, at the store and at a funeral. Johnson testified that his daughter and the Stouts' daughter spent the night together. When Mr. Stout complained about the identity of one of the people crossing his land to log Johnson's land, Johnson had a lawyer write a letter to Stout. This would have been the time for Stout to inform Johnson or his lawyer that he objected to Johnson's use of the route.

In addition to Mr. Stout's telephone calls previously described, in May 1998 Mr. Stout called Mr. Gore to complain about the gate on Section One being bent. Mr. Gore purchased a new gate for Mr. Stout. Mr. Stout showed no reticence about calling Johnson and Gore. Yet neither during those hostile telephone conversations, nor during any of their other encounters, did Mr. Stout or any other member of the Stout family tell Johnson or the Gores that they did not want them using the route, not until 2003 after Johnson and the Gores had been using the route for twenty-three years. Before 2003, Stout's complaints were always about the manner Johnson and the Gores used the route, suggesting that he did not object to their use of it.

The gate at Little Indian Creek Road was not locked, and a rickety, rusty gate just past the cemetery was never closed. (Even Mr. Stout acknowledges that it was mostly left open.)

The requirement for the use to be "adverse under a claim of right" varies with the landscape. This Court has stated, "[t]he nature and character of the land is taken into consideration in determining whether the claimant's possession has been sufficient to establish ownership." *Catlett v. Whaley*, 731 S.W.2d 544, 546 (Tenn. Ct. App. 1987) (citing *Panter v. Miller*, 698 S.W.2d 634 (Tenn. App. 1985); *Derryberry v. Ledford*, 506 S.W.2d 152 (Tenn. App. 1973); and *Lamons v. Mathes*, 33 Tenn. App. 609, 232 S.W.2d 558 (1950))

The standard is different for this hilly, relatively remote area than for densely populated areas or commercial and industrial areas, where land prices are higher and presumably, more careful attention is paid to the details of conveyances.

This Court in *Michael v. Jakes*, No. M1999-02257-COA-R3-CV, 2002 WL 1484448, at *10 (Tenn. Ct. App. July 12, 2002), stated:

> The determination of whether the claimant has exercised sufficient dominion or control depends on a number of circumstances, and the decision should be made in the context of the entire factual background, not just on whether specific actions were taken.

*Michael*, 2002 WL 1484448, at *10.

Moreover, in simple terms, the Tennessee Supreme Court defined "adverse" and "hostile" as follows:

> "Hostility" in possession does not require the adverse possessor to walk his boundaries inveighing against all who draw near, nor does it require the possessor to forcefully eject those who may come upon his adverse holding especially when they are there with his permission. The term does not imply ill will or actual enmity, but merely means that the party claims to hold the possession as his, against the claims of any other.

*Hightower v. Pendergrass*, 662 S.W.2d 932, 937 (Tenn. 1983).

Not much maintenance is required for the 125-meter Section Three on the Stouts' land, but what maintenance there has been, Johnson and Gore have done it. They have bush hogged the road many times. They have cleared and kept open either side of the two parallel tracks on its short passage through the woods, though according to Gore, the Stouts' cattle now keep it close-cropped. The stretch of Section Three that follows the narrow side ridge through the woods receives enough use to keep vegetation from taking over the two parallel tracks. These tracks leading up to the gate and their use are apparent to anyone who looks at them. According to Johnson, the tracks looked like they do now when the he purchased the land.

There was nothing secretive about Johnson's passage along the Junior Anderson Road route. Johnson testified that throughout his ownership he continually used the Junior Anderson Road route to access the part of his land he sold to the Gores. Johnson stated that when he went to that part of his land, he exclusively used the route across the Stouts' land. When he left the ridge land, he returned the same way.

The Gores' use of the land is recreational, mostly for hunting. Mr. Gore uses the Junior Anderson Road route regularly and routinely, about every week-to-ten days he testified. He never goes more than two weeks without going to the cabin. As previously described, Mr. Gore used the route to hunt when Johnson still owned it. It took Mr. Gore a year and a half to build the cabin. He did most of the work himself, but five or six other people helped him. Sometimes the helpers would ride across the Stouts' land with Mr. Gore, and sometimes they would go alone. Trucks, some quite large, used the route to deliver building materials, appliances, a septic tank, and a large propane tank. Delivery trucks follow the route to refill the propane tank. This repeated, regular, visible use is sufficient to establish a prescriptive easement.

Johnson's more frequent use would strengthen the Gores' case. But given the peculiarities of this case, we conclude that the evidence of Johnson's use tacked onto the Gores' use satisfies the requirement that at least twenty years of use be continual, open, or visible sufficient to put the Stouts on notice that a hostile claim was being asserted on their land.

**Continuous Use**

The trial court concluded that continuous use during the prescriptive period was established. On appeal, the Stouts do not contest the continuous use after Johnson sold the land to the Gores. Thus, we need only determine whether the land was continuously used before the transfer of land in 1996. We concur with the trial court.

In *Harrison v. Mullenix*, No. 03A01-9312-CH-00465, 1994 WL 481399, at *4 (Tenn. Ct. App. Sept. 7, 1994), this Court provided insight into the application of the continuous and uninterrupted use as it applies to a prescriptive easement. The court stated:

> The uninterrupted and continuous enjoyment of a right of way does not demand the use thereof every day for the twenty-year period, but does require use of a nature and character, given the *unique circumstances of each case*, that is not sporadic or occasional only for temporary purposes.

> *Harrison*, 1994 WL 481399, at *4 (emphasis added). This Court has further stated, "[t]he nature and character of the land is taken into consideration in determining whether the claimant's possession has been sufficient to establish ownership." *Catlett v. Whaley*, 731 S.W.2d 544, 546 (Tenn. Ct. App. 1987) (citing *Panter v. Miller*, 698 S.W.2d 634 (Tenn. App. 1985); *Derryberry v. Ledford*, 506 S.W.2d 152 (Tenn. App. 1973); and *Lamons v. Mathes*, 33 Tenn. App. 609, 232 S.W.2d 558 (1950)).

That principle is particularly applicable in this case. This is rugged and somewhat remote land. The Stouts do not live on this land, and the Gores do not live on their land. Johnson lives on the part of the land he kept, but he never lived on the ridge part that he sold to the Gores. The trial judge inspected the land in the company of counsel, and observed the difficulty of accessing the Gores' cabin directly from Little Indian Creek Road.

Johnson testified that he "continuously use[d]" the roadway in dispute. Johnson first used the route quite often, he testified, before he repaired fences on his land. After he repaired his fences, using this route for access, he used the route less often. Johnson allowed the previous owner, Huddleston, to continue to run cattle and cut firewood, and, according to Johnson, Huddleston used the Junior Anderson Road route for access. Johnson used the part of his land he sold to the Gores for grazing and timber harvesting. The loggers used the Junior Anderson Road route for access, taking their equipment in and out and taking out the logs. Johnson, with Mr. Gore's help, erected the gate where the route leaves the Stout land.

Johnson's use of the route was of the nature and character, given the unique circumstances of this case, that is not sporadic or occasional only for temporary purposes. *See Harrison*, 1994 WL 481399, at *4. Johnson continuously used the roadway for various uses before the 1996 sale to the Gores. Thus, we affirm the trial court's ruling that the Gores satisfied the continuous use requirement of a prescriptive easement.

Therefore, we have determined that the Gores have a prescriptive easement over Sections Two and Three of the route across the Stout's property. This right to use, combined with their undisputed right to use Section One, means that the Gores have the right to use the entire route from Little Indian Creek Road to Elliot's land.

**Adverse Possession**

In addition to granting the Gores a prescriptive easement, the court also granted the Gores an easement by adverse possession. The Stouts contend the doctrine of adverse possession does not apply. We agree.

The trial court held that the "[Gores] have an easement on the roadway in question pursuant to common law adverse possession and statutory adverse possession. . . ." But an easement cannot be held pursuant to adverse possession. Rather, an easement acquired by adverse use of road is a prescriptive easement. Judge Cottrell explained the difference between the two doctrines in *Michael v. Jakes*, No. M1999-02257-COA-R3-CV, 2002 WL 1484448, at *4-5 (Tenn. Ct. App. July 12, 2002).

> This case involves claims under two similar, but distinctly different, doctrines. . . .
> While the two doctrines, prescriptive easement and adverse possession, have some
> elements in common, *see House v. Close*, 48 Tenn.App. 341, 346 S.W.2d 445
> (1961), there are, nevertheless, some fundamental differences.

-12-

Adverse possession of real estate is a possession thereof inconsistent with the right of the true owner, and when such possession is accompanied by certain acts and circumstances, the title will vest in the possessor.

10 THOMPSON ON REAL PROPERTY § 87.01, at 73-74 (David A. Thomas ed., 1994). One may succeed to ownership rights by "acting openly as though one were the owner against the interests of the real owner...." 7 THOMPSON ON REAL PROPERTY, supra, at § 60.03(b)(6)(i).

On the other hand, an easement is an interest in another's real property that confers on the easement's holder an enforceable right to use that real property for a specific use. *Bradley v. McLeod*, 984 S.W.2d 929, 934 (Tenn.Ct.App.1998) (citing *Brew v. Van Deman*, 53 Tenn. (6 Heisk.) 433, 436 (1871)). Unlike title by adverse possession, an easement is not an interest in the ownership of the underlying real property. As this court has stated:

> Easement by prescription differs distinctly from title by adverse possession. The latter may ripen into an absolute fee simple title. The former does not arise from absolute possession and control, but from a persistent and continuous use of a privilege less than that of ownership. The most common form of easement is a right of passage only which leaves the owner of the underlying estate free to use the property in any way that does not interfere with the easement right.

> *Star Enter. v. Warner*, No. 01-A-01-9502-CH-00036, 1995 Tenn.App. LEXIS 432, at *14-*15, 1995 WL 381652, at *4 (Tenn.Ct.App. June 28, 1995) (no Tenn. R. App. P. 11 application filed).

This court has recognized that the "use and enjoyment" which will give rise to an easement by prescription is substantially the same in quality and characteristics as the possession required to establish title by adverse possession, in that both must be open, continuous and adverse. *House*, 48 Tenn.App. at 345, 346 S.W.2d at 447. However, as the quoted passage from Star Enterprise indicates, there is a distinction between the exercise of possession and control necessary to establish adverse possession and the continuous use element of easement by prescription. See also *Clanton v. Boyce*, No. 86-152-II, 1986 Tenn.App. LEXIS 3493, at *7, 1986 WL 14801, at *3 (Tenn.Ct.App. Dec.31, 1986) (no Tenn. R. App. P. 11 application filed) (stating that "Appellants are confusing the question of adverse possession with continuous use that may be necessary to acquire other rights in property").

-13-

Both title by adverse possession and creation of an easement by prescription require that the adverse possession or use, as the case may be, take place for a specified duration, or prescriptive period. In Tennessee, the prescriptive period for common law adverse possession without color of title is twenty (20) years. *Catlett v. Whaley*, 731 S.W.2d 544, 546 (Tenn. Ct. App.1987) (citing *Tidwell v. Van Deventer*, 686 S.W.2d 899 (Tenn. Ct. App.1984) and *Smith v. Adkison*, 622 S.W.2d 545 (Tenn. Ct. App.1981)); *Moore v. Brannan*, 42 Tenn. App. 542, 565, 304 S.W.2d 660, 670 (1957).

*Michael*, 2002 WL 1484448, at *4-5 (footnotes omitted).

Adverse possession is a claim to *title* in or *possession* of land, and a prescriptive easement is a claim for the *use* of land. There is no evidence that Johnson and the Gores ever possessed Junior Anderson Road. Their maintenance of Section Three, the 125-meter track from Junior Anderson Road to the gate at Elliot's boundary is some slight evidence of possession, but that was early on, to keep the route open. Mr. Gore testified that he no longer bush hogs that stretch because the Stouts' cattle keep it open. Moreover, the Stouts' use of that narrow ridge spine for grazing is inconsistent with Johnson and the Gores' possession of it. Simply stated, the requirements for establishing ownership of the route have not been satisfied. Therefore, we reverse the trial court's finding that the Gores acquired an easement on the disputed roadway pursuant to adverse possession.

## CONCLUSION

The requirements for a prescriptive easement seek to balance the interests of the user who has used a route for a long time and the interests of the owner who is ordinarily entitled to the exclusive use of his own land. In considering the totality of the circumstances in this case, we conclude that the trial court was correct in finding that the Gores have a prescriptive easement for use of the route across the Stouts' land. The easement is limited to the Gores' access to the ridge portion of their land where their cabin is located. Junior Anderson Road past the cemetery, Section

-14-

Two, and the short track from that road to the Elliot's land, Section Three, are not a public road, and the Gores do not possess any right to them by adverse possession.

The judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded with costs of appeal assessed half against the appellants and half against the appellees.

_____
ROBERT S. BRANDT, SP. JUDGE